## Richmond

### AMUSEMENT SLIDES CORPORATION V. JAMES F. LEHMANN.

March 4, 1977.

Record No. 760300.

Present, All the Justices.

*John F. Rixey (Rixey and Heilig,* on brief ), for plaintiff in error.

*Barry Kantor (Adler & Kantor,* on brief ), for defendant in error.

COMPTON, J., delivered the opinion of the court.

On the Fourth of July in 1974 at the Ocean View Amusement Park in Norfolk, plaintiff-appellee James F. Lehmann was injured in a fall after he became airborne while riding the "Sky Slide." The sole issue on appeal is whether plaintiff was guilty of assumption of the risk as a matter of law.

In his tort action against defendant-appellant Amusement Slides Corporation, the owner and operator of the entertainment device, invitee Lehmann alleged that he was injured due to defendant's negligent operation, maintenance and control of the slide.

Specifically, plaintiff contended his injuries and damages resulted when he accelerated "suddenly and violently at a high rate of speed on his slide down the 'Sky Slide' ".

At trial, the issues of primary and contributory negligence, proximate cause, and assumption of the risk were submitted to the jury, which found in favor of plaintiff, assessing damages at $19,500. The trial court entered judgment on the verdict on November 7, 1975, after overruling defendant's motion to set it aside. This appeal followed based on one assignment of error which raised the foregoing issue.

Viewing the evidence in the light most favorable to the plaintiff, these are the facts. On the day of the accident, plaintiff and a female companion went to Ocean View to observe a fireworks display scheduled for 10:00 p.m. Arriving at about 8:00 p.m., the couple decided to "take in" some of the rides in the amusement park. After buying "a book of tickets for [the] rides", they used several other amusement devices before going to the seaside Sky Slide area about 9:00 p.m.

The apparatus in question was a stationary metal slide, approximately 55 feet high at its uppermost point, with a sliding distance to ground level of about 105 feet. There were 16 polished lanes sloping down, each about three feet wide and separated by smooth metal strips which made a chute of each lane. Access to the ride's starting point, located on a platform at the top of the slide, was by one of two stairways located on the sides of the device.

Upon reaching the platform, the patron was directed by an employee of defendant to one of the 16 lanes. The rider would then sit inside a burlap sack, approximately six feet by three feet in size, provided by defendant. With legs extended forward, and assisted by the employee, the rider by "push[ing] himself off" would thus begin his descent.

The speed of descent was controlled in several ways. Across the face of the slide were three large humps, spaced equally from the top to the bottom; these slowed the rider's speed during the trip. But often customers were unable to slide all the way to the bottom when the slide "[became] very slow", usually from "too much moisture in the air." When this condition developed, waxed paper was rubbed on the surface of the slide, thereby causing an increase in the speed of descent. In order to curb the

velocity created by the foregoing procedure, another employee of defendant was stationed on the level surface of one of the humps to squirt water from a small flexible plastic bottle onto the lane or lanes in which any rider appeared, in the opinion of that employee, to be accelerating beyond a safe speed.

Obviously, the allurement of the device was the thrill obtained from a gravity-assisted, fast slide from a great height down an undulating surface.

The plaintiff was 27 years of age and about six feet tall, and weighed approximately 175 pounds. He had ridden, without difficulty, similar slides at other locations on two previous occasions and even though he observed, while waiting to ride this slide, a child "[fall] over on the median strip and hurt her arm somehow", he testified he did not consider it "a dangerous amusement device." Plaintiff's companion decided not to ride the slide because she had "a severe back problem."

As plaintiff approached the stairway to begin his ascent to the platform, he observed and read two large signs posted near the base of the slide. One read:

#### "NOTICE!

Keep Your Hands In Your Lap Until You COME TO A COMPLETE STOP. Do Not TRY TO STOP YOURSELF. Do Not Turn Around While GOING DOWN Slide. Do Not Play Or Show Off While GOING DOWN Slide. If Two Person [sic] Are Sliding On One Mat One Person Must Be Between The Legs Of The Other."

The other stated:

#### "ATTENTION

Water Is Used To Control The Speed Of The Ride. If You Get Slightly Wet, We Are Sorry. IT'S FOR YOUR SAFETY."

Plaintiff failed to see a third sign placed at a different location near the slide which advised:

"If You Are Over Twenty-Five This Ride Ain't Your Thing."

As he ascended the stairway, he heard the following tape recording being continuously played through a loudspeaker:

"For those who are about to ride the thrilling Sky Slide, please listen and follow the instructions very closely:

"When you reach the top of the slide the operator will assist you and tell you exactly what to do. As you come down the slide lean slightly forward and hold onto the sack and do not let go for any reason. Do not turn around or rock back and forth as you are coming down the slide. Follow all the instructions very closely and have a wonderful slide."

Plaintiff testified that when he reached the platform, he "sat down in the middle of the top preparing to go down". One of defendant's employees directed plaintiff to move and sit in "the fourth lane from the ocean side." Plaintiff followed this directive. The employee then told him "to put [his] feet in the bag, to lean forward and to hold onto the sides of the bag." Plaintiff also followed these instructions. At trial, plaintiff gave the following account of what transpired next:

"Just before I let go to go down the slide he said, 'This lane has just been waxed.' I didn't think anything of it. I started sliding down and immediately when I went down the first slope I noticed that I was going much in excess of the speed I had been on the previous slides. As I proceeded down the slide I continued to build up speed. On the second slope when I went over it I was just, you know, kind of barely making contact with it. When I went down the slope, . . . I didn't make contact with the slope except right where it levels out, where it goes out straight. I just hit the very base of it, and then when I went off the last slope I cleared it completely and impacted in my lane at the bottom of the slide."

The record shows plaintiff's excessive speed resulted from the failure of defendant's employee, stationed on one of the humps, to put water on plaintiff's lane as he descended. The employee testified plaintiff "went past me fast before I could even squirt it" and that it was his intention to "squirt that lane" as plaintiff was coming down but that his "judgment at that time was not as quick because we were very busy and I was mostly very tired."

The associated defenses of contributory negligence and assumption of risk differ in that an objective reasonable man test is brought to bear on the former while the standard primarily to be applied to the latter "is a subjective one, of what

the particular plaintiff in fact sees, knows, understands and appreciates." *Restatement (Second) of Torts* § 496D, Comment c (1965). Contributory negligence is carelessness. Assumption of the risk is venturousness and has two requirements: the nature and extent of the risk must be fully appreciated and the risk must be voluntarily incurred. *Buffalo Shook Co. v. Barksdale,* 206 Va. 45, 48, 141 S.E.2d 738, 741 (1965). "Knowledge of the risk involved is essential to its assumption." *Budzinski v. Harris,* 213 Va. 107, 110, 189 S.E.2d 372, 375 (1972). *See* W. Prosser, *The Law of Torts* § 68, at 447-50 (4th ed. 1971).

Defendant, in contending the trial court erred in deciding assumption of risk was an issue to be determined by the jury, argues that plaintiff knew and appreciated the risk involved because "he had ridden similar sky slide rides two times previously", because "moments before he incurred his own injury, he witnessed . . . a young girl being injured on the slide", and because "his companion would not ride with him because she had a bad back." Defendant also urges that plaintiff voluntarily incurred the risk because "he willingly purchased a ticket for the Sky Slide and . . . proceeded to ride [it]" admitting, so the argument goes, that "he rode the slide for the purpose of experiencing a sense of thrill or enjoyment" which, defendant contends, "satisfies the element of venturousness". We reject these contentions because we believe reasonable men can differ whether plaintiff fully appreciated the nature and extent of the risk here involved.

It is true plaintiff assumed the risk of injury resulting from a ride down a steep incline at a controlled yet rapid speed. But plaintiff did not assume the hazard of injury due to the negligent failure of defendant's employee to spread water on the waxed slide when plaintiff began to accelerate to an excessive and dangerous speed. This is especially true when, as here, plaintiff had been advised by the sign that for the customer's *safety,* water was used to *control* the speed of the ride. From the explicit instructions broadcast by the signs and over the loudspeaker, the plaintiff was justified in believing that the slide was safe, *provided* the instructions were followed. He followed the instructions; yet he was injured when defendant's employee was too busy and too tired to discharge his responsibility of decelerating plaintiff with water. There is not one bit of evidence

to establish that plaintiff would not have been slowed in his descent to a safe speed by a proper and timely application of water. Indeed, the evidence affirmatively shows that water was routinely used successfully to retard sliders' rates of descent and permit safe completion of their rides. The testimony was that the "water creates some sort of drag on the burlap ... and it causes more friction which acts to slow [the burlap] down." Therefore, the failure of defendant's employee to spray water amounted to an additional negligent act, the risk of which was not assumed as a matter of law by plaintiff when he undertook to experience the thrill of a rapid downgrade ride.

And, contrary to defendant's assertion, the evidence of plaintiff's prior rides on similar slides, of the minor injury to a child rider witnessed by plaintiff, and of a reluctance by plaintiff's ailing companion to ride, is not sufficient to make assumption of the risk a question of law in this case. Those circumstances afforded no warning to plaintiff of employee inattention, which was the risk here involved.

Defendant places great reliance on *Schmidt* v. *Fontaine-Ferry Enterprises, Inc.*, 319 S.W.2d 468 (Ky. 1959), in which the court held that a patron injured while riding on a similar amusement device assumed the risk of injury as a matter of law. *See* Annot., 69 A.L.R.2d 1062. But there, in contrast to the evidence here, knowledge of the excessive slickness of the slide, apparent from a mere glance, had been acquired by the plaintiff from repeated use of the slide in question. In the present case, plaintiff had not used this particular slide before and, even if we assume the slide's slickness was noticeable from a casual glance, nevertheless, it was for the jury to decide, as we have said, whether employee inattention was a hazard assumed by this plaintiff under these circumstances.

For these reasons, the judgment of the trial court will be

*Affirmed.*

HARRISON, J., dissenting.

Appellee obviously patronized the Sky Slide for the thrill, excitement and adventure involved. The thrill of the ride occurs during descent when the rider becomes temporarily airborne, or nearly so, at the humps built into the slide. Whether a rider becomes airborne, and the degree thereof, depends upon a number of factors. The velocity of the descent is necessarily determined by the angle of the slide, the weight of the rider, humidity, wind resistance, weather conditions, when the lane was last waxed, the amount of wax applied, the extent of use after the last waxing, the amount of water, if any, applied, and possibly other conditions.

We have here a 27-year-old man who admitted that he was familiar with the manner in which sky slides are operated. He must have known the variables involved. He had just witnessed an accident. The signs that he saw, and the recordings that he heard, apprised him of the fact that the slide posed an element of danger to all users, particularly to those over the age of twenty-five years, as was Mr. Lehmann. Appellee was told that the lane he was to use had just been waxed. He therefore knew he was to be its first user after the waxing. Notwithstanding all the warnings, and his knowledge of and previous experience with sky slides, he ventured to take the ride which resulted in the accident. He had been warned of just this possible result.

The doctrine of assumption of risk rests on two premises: (1) that the nature and extent of the risk are fully appreciated; and (2) that it is voluntarily incurred. *Davis* v. *Sykes*, 202 Va. 952, 954, 121 S.E.2d 513, 514 (1961). *See also Leslie* v. *Nitz*, 212 Va. 480, 184 S.E.2d 755 (1971), and *Landes* v. *Arehart*, 212 Va. 200, 183 S.E.2d 127 (1971).

In *Landes* v. *Arehart, supra,* we quoted with approval from *Hunn* v. *Windsor Hotel Company*, 119 W. Va. 215, 218, 193 S.E. 57, 58 (1937), as follows:

" 'Where a person has knowledge of and fully appreciates a danger, and under such circumstances, without any special exigency compelling him, he exposes himself to such danger or peril, his act in the premises may be deemed to have been voluntary. . . . Freedom of the will, in fact, is the thing emphasized by the principle asserted in the maxim *volenti non fit injuria.*' " 212 Va. at 203, 183 S.E.2d at 129.

Lehmann made his decision to take the ride "without any special exigency compelling him", with knowledge that the lane he was to use had just been waxed and after having been fully advised of the danger involved. He fully appreciated the nature and extent of the risk and voluntarily assumed a known hazard.

I would reverse the judgment of the lower court.

CARRICO, J., joins in this dissent.